May it please the Court, David Covell on behalf of the Plaintiffs' Appellants, four of them, three related cases. The lower court here found that plaintiffs had adequately pled the direct evidence of monopoly power. They did that base, or the judge did that, Judge Engelmeyer, based on JP Morgan's, and this is quoting from his first decision, or paraphrasing, their ability to amass a dominant position in certain spread contracts and significant pricing anomalies beginning in early 2011. That's on the special appendix at 32. The lower court, though, went on to find that plaintiffs had not alleged exclusionary conduct, a willful acquisition of monopoly power. And then after amendments in a second decision, Judge Engelmeyer found that, upheld that holding again, and then found that a benchmark plaintiffs had used, 25 pages of allegations, statistical allegations, was implausible. And that benchmark was the one that, at least according to our plaintiffs, showed these pricing anomalies that were upheld under the direct evidence of monopoly power decision in the first decision. We respectfully think that Judge Engelmeyer erred on the willful acquisition and on his finding about the — on the benchmark, and they're related. But the willful acquisition prong after amendment was pled well beyond what we think is required under Rule 8. The plaintiffs pled 14 instances in February of 2011 when J.P. Morgan's agent went to the Comex Settlement Committee at the end of the trading day, which is around 124, 125, 130 in the afternoon here in New York, and misrepresented and pressured the employees of Comex to report what we say were invalid prices, artificial prices. Sotomayor What did they misrepresent? Well, we've given the spreads themselves. The spreads are, and it's paragraph 103 of the — I'll refer to the Shack second amended complaint, but the representations were of a market, a spread between silver futures, deferred spreads, that were — and this is one of our bases for the intent standard that Judge Engelmeyer wanted to see. They were not diametrically opposed, but they were inconsistent with what J.P. Morgan was doing at the same time in the physical market. Is it true that none of the transactions were consummated during the day, on the day that they put in bids, so you're comparing what they put in to trades that didn't exist? Well, Judge Engelmeyer did find an inconsistency in the pleadings, and this is paragraphs 87 through about 103, and he found — the internal inconsistency he found was we had pled, the plaintiffs had pled, that there had been — there was no trading activity, and then the — and that reference is a — it's a careful reference in that sense, because in paragraph 28 of the Shack second amended complaint, it's clear what trading activity means. The COMEX defines it as actually executed trades in the last minute of trading. But what we say, and we say this in paragraph 87 on the — in the last sentence, but the — but what trading means generally, generically or colloquially, trading means the activities during the course of the day. And we've alleged very clearly that there were bids and asks during the course of the day. Were any of those contracts consummated on the bids and asks? Over time, there were. We don't — During the day. During the day that — we say there was very little actual trading activity of these deferred spreads during the course of the day, very little. But there was bid and ask activity during the course of the day, and that the end-of-day behavior of J.P. Morgan, not only — not only pressuring and misrepresenting to the COMEX settlement committee, but coming in in the last 10 minutes and providing what we say are highly uneconomic — Uneconomic behavior in an antitrust sense means doing something that an economically rational actor wouldn't do. It doesn't necessarily mean something that is inconsistent with the underlying market, right? So when you say it's uneconomic, all they're doing is making a misrepresentation, which is in their financial interest, I thought, because they're trying to manipulate the market to your specific disadvantage. That's right. Well, exclusionary conduct is keeping — is trying to do things that are inappropriate in the normal setting. There's got to be something that gets it above just profit motive. Well, I'm trying to understand, is every fraud or every manipulation somehow anticompetitive? Because I thought the allegations here were that what they were trying to do was to sort of force your clients to give up their positions cheaply so that J.P. Morgan could get them at a lower price than was necessary — would otherwise have been the case, right? That was one consequence of what they did. But violating the rules of the COMEX are one way of doing it. Well, that's very bad, and that's a manipulation, and that would violate the Commodities Act. But what I'm trying to figure out is what makes that anticompetitive? If I'm trying to cheat you out of your securities, that's nasty and illegal under various theories, I suppose. But why is that anticompetitive behavior? If you are driving out your competitors from the market, these, as alleged in all the complaints, these three different plaintiffs were the market makers who would take the other side of J.P. Morgan's trades in December and in early January. And by forcing them out, J.P. Morgan was able to have — and this is alleged throughout the complaint — unfettered ability to manipulate the spreads. I'm having trouble, again, understanding how this works. And, you know, maybe it's because I have trouble distinguishing between the monopoly power and the anticompetitive behavior in a market like this. What is it that they're trying to monopolize? They — what they — and this is in the case law, in the crude oil decision cited by the lower court and the cotton case cited by the lower court. The monopolization — Those are about cotton and crude oil. I want to understand what they're monopolizing here. Exactly. I'm trying to analogize, though. In those cases, you have domination of a particular futures contract in order to manipulate a spread. And there's no difference between those cases in that sense than here. Here you have domination of — and we've shown it in paragraph 72 and 73, domination — and the Court found it — of the December 2014 futures contract. And we state very clearly, and this is — What does that let you do? I mean, I understand what it means to monopolize silver. It means if I want silver, I have to come to you and I have to pay whatever price you charge because that's — you've got it all. But I'm not sure I understand how this works when — am I not still free to bet against? I mean, how do you — how does J.P. Morgan get to dictate the market price of futures? By — J.P. Morgan, if it's in their bidding and asking, that's how — that's how futures are determined. Well, I understand how you manipulate it, but once they've got you out, now what happens? What do they do once they've got you out? So we've — and this is a question I suppose that Judge Engelmeyer had in the first decision, and we came back with allegations based on conversations with people on the floor at COMEX at the time and based on Plaintiff Grumet's experience as a lawyer drafting these contracts at Drexel Burnham. But the allegations are that J.P. Morgan had a long-term contract with miners or a miner, and that long-term contract was priced — it didn't have an actual price, but it was priced based on a benchmark, and that benchmark was the futures price, the deferred futures price. And — Now they're cheating the miner. I still get — I still see this as various kinds of fraud, and I'm not sure I understand why the monopoly power — how monopoly power is happening here. If you have monopoly power, you can extract monopoly rents. And this is monopsony in this sense because they're — they're purchasing it from the — from the miner. But you — but it takes that power to be able to drive down the price. If you dominate the last spread, if you dominate this edge of the accordion, then you can drive down price and buy for less. That requires monopoly power. And that's in a — we've alleged is — Can I ask if the gist of your complaint is that the short-term prices were higher than they should have been? Is that what drove out your clients? The — In other words, it was backwardation, which, by the way, must exist because there's a word for it. Right? So it's — it just doesn't — they didn't make it up. Your Honor, backwardation is something that normally occurs, and this is in paragraph 40 of our complaint, I believe. Backwardation is something that normally occurs when there's a shortage in the short-term. Right? There was — and this is why we compare it to SIFO. SIFO is a 12-month representation of the spreads, the — from now out 12 months. These spreads that were manipulated were manipulated — some of them, the December 12 to December 14 spread, were two to four years out. You don't normally have shortages, and this is clearly alleged and logical, too, in the — it's in the complaint. You don't normally have backwardation that far out. You certainly don't have more backwardation that far out when you don't have as much nearby. But you don't normally, but it has happened, right? I don't know that that's the kind of situation that would happen very — we say backwardation alone in the near term happens very rarely, whether it happens two to four years out. You understand what this is saying, saying, oh, there's not — there's a scarcity now, it's not so bad, but two to four years out, boy, there's going to be a big one then. That doesn't make a lot of sense. And the statistical analysis we showed confirms that, at least for the purposes of Rule 8, confirms it. We have 25 pages of statistical allegations that, with respect, Judge Engelmeyer eyeballed and found inconclusive. But he was eyeballing one graph. And if you look at the kind of work that was put here, we show that there was a big difference between what happened prior to 2011 and what happened in 2011. Thank you. Thank you. Let me just ask one question. I suppose at a minimum you're suggesting, when you refer to all the work that's gone into this complaint, which is considerable, that in the nature of things, this raises questions of fact, and therefore, at a minimum, from your perspective, this should go back to permit a period of discovery and then perhaps motions for summary judgment. Absolutely, Your Honor. We believe that on the willful acquisition, those 14 days in February, we got very specific. And in terms of the benchmark, we think we invested a lot of time. The plaintiffs invested a lot of effort to show that there was a problem here. Thank you. May it please the Court, Amanda Davidoff for J.P. Morgan. Your Honors, the plaintiffs here pleaded what the district court recognized as fundamentally a Commodities Exchange Act claim. And only when that claim was found time-barred turned their attention to the antitrust claim that's before you. Judge Engelmeyer reviewed the complaints in detail, both the original complaints and the amended complaints, and dismissed the antitrust claims for failure to allege willful, exclusionary, or anti-competitive conduct for four reasons. First of all, the allegations about J.P. Morgan's trading were both conclusory and self-contradictory. The allegations as to SIFO were not borne out by the complaints. There were no adequate allegations of intent. And the gloss of predatory bidding did not fix those problems. Now, the Court can affirm on any of these grounds or for either of two alternative reasons, because the complaints did not adequately allege monopoly power in a huge antitrust injury. I'd like to begin with why each of the district court's four reasons for dismissing the complaints were correct. Now, as to these allegations of bids and asks and trading, the district court rightly observed that those were far too conclusory to support plaintiffs' claim that J.P. Morgan was manipulating calendar spreads through bidding or by haranguing the ComEx settlement committee. The complaints don't allege a single bid or trade or an instance of haranguing, even though the plaintiffs were in the market and, as they allege in footnote one of their complaints, had access to trading records and reports of trading activity. What would an instance of haranguing look like? What is that? Well, the plaintiffs allege, Judge Cabranes, that most of the long-dated future spreads were traded in an open outcry fashion on the ComEx floor. So an instance of haranguing could be overhearing Mr. Gottlieb of J.P. Morgan haranguing a broker, for example. And what does that consist of? Well, according to the complaint, in very general and conclusory terms, it alleges that Mr. Gottlieb was haranguing various brokers to put before the ComEx settlement committee his desired spreads. But again, not a single instance is alleged, despite the plaintiff's participation in the market. Now, separately, as the district court found, aside from this problem of the allegations being conclusory, they were self-contradictory because plaintiffs based their claims on the idea that J.P. Morgan's or its brokers' submissions to the ComEx settlement committee were inconsistent. So I want to go back to this haranguing business. The allegation is that somebody from J.P. Morgan called up someone on the ComEx committee, I take it is what haranguing means, and says, you should pay attention to this data, which they would pay attention to under their rules, apparently, unless they thought it wasn't right for some reason, and then they could consult other data, right? It's actually even more attenuated than that. The allegation is that somebody from J.P. and tell them to pay attention to that data. And so why is that conclusive? They said Gottlieb called a broker and asked him to do something, taking out the harangue, which is just an intensifier. He called up a broker and asked him to do something. So what is conclusory about that? Isn't that a fact, something that somebody either did or may not have happened, but that's what they allege. Somebody spoke to another person and asked him to do something. Well, the reason that it's conclusory, Your Honor, is there's no identification of any time or place that that happened. It's just a general assertion that this was going on during late 2010 and early 2011. Can you say to whom it was said, on what date in a complaint, to make it not conclusory? Well, in this instance, it would be, yeah, that would be one way to do it, Your Honor. It would have to be some greater amount of specificity than generally somebody from J.P. Morgan was pressuring people generally to support J.P. Morgan's desired spreads. Wouldn't that come from discovery? Well, no, Your Honor. I mean, again, as in the plaintiff's own complaints, they allege they were in the market, they had access to trading activity. There are 15 brokers on the floor. It's a very small market. Most of it is conducted in an open-outcry format. I would have thought that conclusory was something like they engaged in anti-competitive behavior, that is, using a legal general formulation, not stating specifically how they did it. Now, here there are kind of factual allegations. You're saying they're not specific enough. You're saying there's not enough detail with respect to whom these — who had these conversations with whom on what particular dates and what did they say. This Court has a strong tradition of recognizing conclusory sort of legal assertions for what they are. I'm not sure this is a legal assertion. It says they habitually, apparently is your problem, that they're not saying on May 1st they did this, at 3 p.m. on May 2nd they did this. It just says in general over a period of time they did this specific thing. They called up brokers and asked them to talk to COMEX and say something. So this situation is really indistinguishable from two cases this Court has decided in the last few years. In Baltimore v. Citigroup, which was the auction rate securities case, the plaintiffs had alleged a high level of inter-firm communications, made that allegation. And the Court said, no, that's not specific enough. There they even alleged two instances of inter-firm communications. The Court said, that's the functional equivalent of a legal assertion. You've got to provide us with more. And that was under Rule 8. Similarly, in New Jersey Carpenters v. RBS, this Court held that, explained that a general claim that originators abandoned underwriting guidelines, again, sort of sounds factual, was the functional equivalent of a legal assertion, that there were false and misleading statements in a complaint. So here you've got two problems. One is the general assertion that haranguing people occurred is the functional equivalent of saying you engaged in exclusionary conduct. But the second problem is, as Your Honor pointed out earlier, there's nothing exclusionary about that conduct, even if it had been adequately pleaded. It's the second part of the Twombly analysis. You know, the first question is, are there plausible factual allegations as opposed to legal assertions? And the second part is, to the extent there are well-pled allegations, do they rise to the level of creating an inference that there was plausibly illegal conduct? And the answer is no, because there's nothing about this haranguing or the bids and offers that is exclusionary or anti-competitive. Now, the District Court also correctly rejected plaintiff's theory that J.P. Morgan's reports to the ComEx Settlement Committee about calendar spreads. This is one of the things I'm just having trouble understanding. If there is a process for determining a settlement price and a participant in the market tries to manipulate that because for whatever reason they think it's in their interest that the price be high rather than low, and so they put in a bid that will affect the way this process plays out, right? Now, that may be dishonest or manipulative, but, I mean, your argument is that's not necessarily anti-competitive. That's just making, you know, taking advantage of this process. It's not excluding anybody else from putting in a different bid or a different ask price or something else. That's absolutely right, Your Honor. Obviously, we don't believe the allegations that any manipulation occurred are themselves plausible. But going beyond that, even if plaintiffs had plausibly alleged some manipulation of long-dated futures calendar spreads, there's nothing that connects that, as Judge Engelmeyer said, to anti-competitive conduct, to conduct that would be irrational but for an anti-competitive effect. Just to give an example, plaintiffs here don't allege that there are any barriers to entry. So as you pointed out, what next? If they do exclude somebody, how does that benefit them by reducing competition or controlling prices if anybody else can come into the market? So there is a lack of connection between the conduct alleged and anything anti-competitive, and that was clearly what Judge Engelmeyer was concerned about as well. Well, the allegation is that the plaintiffs, who were the counterparties in some cases, maybe in all cases, were forced out of the market because of their uneconomic positions and the demand for margin. So they disappear. I mean, does J.P. Morgan find other customers, or what do they do? That's the question that Judge Lynch asked. Right. I mean, and I do think, Your Honor, that that cuts in support of Judge Engelmeyer's decision because, again, we don't know from the complaints what they do, but the point is there's nothing pled in the complaint that this exclusion, supposedly, of plaintiffs from the market would keep others out of the market. In fact, to have a market, there have to be people on both sides of these contracts. They were forced out of the silver market by the fact that the prices were so high, unreasonably, they argue, and they couldn't meet their margin calls. Well, Your Honor, that's harm to competition. Sorry, harm to competitors and not to competition, which is what is required to show exclusionary or any competitive conduct. The Supreme Court said in the Linkline case that it's okay to have monopoly power. It's okay to charge monopoly prices. It's okay to charge monopoly prices that are bad for your competitors. What we care about is a harm to the structure of the market and a harm to competition, and that's what's absent in this case and why Judge Engelmeyer correctly dismissed the complaints. What was the competition to J.P. Morgan, if any? Well, plaintiffs allege that they were one of some number of small players in the market. They don't identify how many, but to the extent there was a market, there had to be somebody in there other than J.P. Morgan because these are two-sided contracts. So who were they beside the plaintiffs? Well, plaintiffs allege that J.P. Morgan achieved a dominant position in the market because of a historical accident. It had been a market that was filled with many banks acting as market makers over time, and by 2011 they say the banks had voluntarily mostly exited the market, leaving J.P. Morgan and two other banks as the market makers. If I understand you correctly, J.P. Morgan can't function unless it has a counterparty. Isn't that correct? That's right. These are two-sided contracts. There is no— When they force everyone out of the market, what do they do? Well, Your Honor, I'd submit that's one of the reasons this is an implausible anti-competitive theory. Forcing people out of the market is not how you keep a market functioning. If they force people out of the market, there's no market. Correct. Correct. If you force everyone out, there's no market. Is there a market now in silver? Again, not part of the record, but yes. Your Honors, briefly, the Court can, of course, affirm on the grounds found by Judge Engelmeyer, in addition, we argued that the plaintiffs hadn't adequately alleged monopoly power in a relevant market. Judge Engelmeyer agreed that there was a glaring pleading error in the complaints because plaintiffs hadn't adequately alleged that their market was made up of products that reflected the typical analysis courts use in antitrust cases, cross-elasticity of demand and substitutability. He got around this problem by saying plaintiffs alleging direct evidence of monopoly power don't need to plead a relevant antitrust market and can just refer to some area of commerce. That's an incorrect reading of this Court's precedence and a significant error. Your Honors, in two 12B6 cases, the Chapman case that we cited and the Concord Associates case that we cited, this Court affirmed dismissal of complaints on 12B6 grounds where the plaintiffs in Chapman, a provider of restraint training services, and in Concord Associates, a gambling racino operator, alleged that they were excluded from the market. And in both of those cases, this Court said it is always necessary to plead an antitrust market according to the strictures that we have set for pleading those markets. The Heerwagen case is also very important, even though it was a class certification decision, because the plaintiff there made the exact same argument the plaintiffs here are making, which is that in the cases where the plaintiff is using direct evidence of monopoly power, something less is required in the way of plausible market allegations. And this Court said no. Whenever you're in front of us, whenever you are proceeding on an antitrust theory, and especially in a Section 2 case, it is critical that you allege a plausible antitrust market and prove plausible antitrust market. So that is another basis on which the Court could affirm. I see my time is up, and we respectfully ask that the Court affirm Judge Engelmeyer's well-reasoned decision. Mr. Covell, you have three minutes. Thank you, Your Honor. I'd like to take on the last point first, which I find remarkable, this assertion by the defendants at this point that plaintiffs haven't alleged substitution. I direct the Court's attention to page 23 of the second oral argument before Judge Engelmeyer where the J.P. Morgan conceded that plaintiffs had adequately pled that arbitrage between the physical market and the futures market for deferred spreads was not possible. Now, what that means is there essentially is no substitution. If there's no substitution for those deferred spreads, then the finding that Judge Engelmeyer had in the first decision that there were no – that plaintiffs hadn't alleged that there couldn't be a substitute from the physical market, that that blows up. And we have alleged a relevant market, which is the silver futures market. Without arbitrage, that's all you got, those silver spreads. You don't have the physical market. That's something that was very clear, and it was conceded by the defendants. I want to also take on this issue about this being a CEA, Commodity Exchange Act claim, and not a monopolization claim. This Court in Strobel v. NYMEX put to bed the notion that one doesn't – can exist in isolation from the other, and really all that has to be pled is the elements of a monopolization claim here. And when it comes to futures markets and spreads – and again, I guide this Court to some excellent decisions in crude oil by Judge Pauly and cotton by Judge Carter – these are short-duration monopolizations. So this answers one of the questions, which is what happened to the market afterward. Well, it was dislocated significantly, and we show that through the statistical analysis. But the monopolization is short-term. We're talking about 15 to 20 days or two months to three months. That's what's been sustained as monopolization in the context of a futures squeeze. And that's what we have here, a squeeze of a deferred futures contract. This is a contract in paragraph 72 and 73 of the second amended complaint for Daniel Schack. It shows it. It shows that J.P. Morgan had over 68 percent of the open interest. We think much more, but we – although it's a two-sided market, you don't know who's on the other side. The only way we were able to infer that J.P. Morgan was on the other side is because J.P. Morgan forced all of our – all of the plaintiffs out. And so we have that information through our plaintiffs, not through any objective other kind of information. So – and this whole idea of haranguing, it's not a two-step process. These were agents for J.P. Morgan on the floor. Mr. Gopley was not on the floor. My clients were not directly on the floor for the most part. This agent went to the COMEX Settlement Committee. Paragraph 87 sums it up. But there are – we have the names of the people on the settlement committee who were not harangued, who were pressured, misrepresentations were made to them. And the object was to dominate this – these future spreads. And the edge of the accordion is what we call it, is the most – is the farthest one out, which is illiquid. And that allows – And please explain to me pressured? Pressured means to me we're going to do something to you if you don't adopt this. Harangued just means said something loudly, argued for something. We use the term pressured. We use the term misrepresent. We use the term harangued once, unfortunately. And what are we talking about? I don't understand what we're talking about here. Other than they entered a bid, and a bid is relevant data that the COMEX uses to set the settlement prices. I understand it. Now, they can also do something else. I take it they can refer to other information. And somebody at J.P. Morgan argues, no, under your rules, you should pay attention to our bid. That's the right way to do this. Now, what is illegal about that? After the close – it violates the COMEX Settlement Committee rules, which is it has no reflection on the – on what was going on in the market at the time. What is the – the bid itself? All you're saying – all this haranguing and pressuring is just an element of – and maybe this is enough, I don't know – that they put in a false bid. And then they argued you should look at that bid. But they should look at the bid. The only problem is that the bid is in some sense false, right? Isn't that the heart of this? That is the heart of it. I mean, the context is on the floor. This happens – a group of people are together, the settlement committee. This happens in what's essentially a scrum on the floor, or used to be before electronic trading. And their haranguing or the pressuring is, no, it's got to be – you know, it's got to be this price. This is what – this is where the price was based on, A, you know, the bids and asks that were thrown in at the very end of the day that we say had no reflection on the physical market. And these low-level employees for COMEX were susceptible to this pressure, and there was no counterbalance to it because J.P. Morgan was the big fish here. That's what we've alleged. That's what the plaintiffs had alleged. They were the ones dictating what happened down there, and the low-level COMEX employees were going to listen to them. Mr. Koval, maybe you could just take a moment before we adjourn to tell us what – in the event you were to prevail here and there were a remand for further proceedings, what is it that you would seek in the way of discovery? What would be your objectives in these circumstances? A number of things. We would be looking for – the communications all around this period of time, we would seek the agreements between J.P. Morgan and the physical producers, the minor that was discussed – that's discussed in the motive allegations. We would seek their – the positions. As I said, this is a two-sided market, but positions are not openly known. It's an anonymous market for the most part, and we'd seek their positions. And we would try to establish, to a greater degree than Rule 8 is necessary under We think it continued for several months after the plaintiffs were forced out, based on the market behavior after that. And how would you tend to prove that? By what means? Depositions, presumably? Yeah, documentary evidence. Okay, thanks very much. Thank you. We'll reserve the decision.